Judge Boceweb
delivered the opinion of the Court.
Constance Blakey made her last will and testament, and died, in which she appointed Thomas Blakey sole executor, who undertook the execution of it, in January, 1824. ft directs the executor to sell all her slaves, “giving the said negroes the full right of choosing their masters; the mother and hither of the younger negroes choosing the masters they would wish their children to belong to.
She adds further, “I wish my executor to sell all the balance of my property, of every description, *675 «pon certain terms, as his judgment may best direct, and the money arising therefrom, as well as the money arising from the sale of my negroes, first to go to the payment of all my just debts, and the balance to be equally divided between my living children, such as should be living at the time of my death.”
She had only three children living when that event occurred, Thomas the executor, Pleasant Blakey and. Robert Blakey, and owned five slaves. The personal property, except tile slaves, was inconsiderable, but it appeared that she was clear of debt.
In April, í 826, Pleasant and Robert filed their bill in chancery against the executor; to compel a sale of the slaves, and payment to them of the portions of the estate, to which, under the will, they were entitled. Tbey set forth the above facts, and allege that 1000 weight of pork, and some corn and tobacco, and a $4 cash note belonging to the estate, had not been included in the inventory, which the executor had caused to be returned to the county court; that he had failed to sell, or to hire the slaves, but claimed them as his own property, under a fraudulent pre tended sale, which he had made, and had beconrx himself the purchaser, at a price greatly below theii real value; that he was insolvent, or nearly so, anc had threatened to remove the slaves out of the state of Kentucky, which, if done, would leave them without remedy, as the securities in the bond executed b) him, as executor, were insufficient. They also charge-that he had failed to make a settlement of the business of the estate, and positively refused to make anj distribution. They pray that the slaves may be sold with a view to a proper distribution of their price, and the executor be rendered responsible for the amount for which they might have been hired, &c.
The executor demurred to the bill, which was overruled, and theu made an unsuccessful attempt to procure a discharge of an order made by the chancellor, restraining him from removing the slaves beyond the jurisdiction of the court.
In April,! 1827, he filed an answer, exhibiting very-strong marks of fraud and dishonesty. He admits the will, the death of the testator, and his appoint *676 ment as executor; but insists that he had fairly become the owner of the slaves, by a purchase under a sale, which he had made.on a credit of two years; the two years had not then expired, (the sale having been made in January, 1826,) and' that be could not be held responsible to the complainants,until the lapse of a reasonable time, after that period. He denies the jurisdiction of the court, and insists that a bond with security had not been executed by his brothers, to refund, in case debts should appear to be due by the estate.
He insists, that at the death of his mother, she had a son living by the name of Dudley Biakey, who was entitled to one fourth of said estate, and that Robert, the complainant, had purchased at the sale of the personal estate which had been made, articles to the amount of $73 75 cents, the payment of which he had not secured; that he had paid him {$44 37 1-2 cents, of his legacy, and that he was insolvent,
He admits that there were belonging to the estate, some tobacco, corn, pork and a $4 note, when he qualified as executor, which had not been included in the inventory, but not as much pork as was charged in the bill; that for the tobacco and corn he was not responsible, and had, by mistake, omitted to account for the pork and the note, lie also states, that he had entered into a settlement with the commissioners appointed by the county court to settle with him as executor, who had allowed him the surp of $138, for his trouble and charges in attending to the business of the estate. Pie denies all the other allegations of the bill, and all fraud.
.At the October term, 1827, a written order, pur-portingto have been signed by Robert Biakey, was produced in court, requesting the court to dismiss the suit as it related to him.
It is noticed on the record in the following words; “this day came complainant by his counsel, and moved the court to dismiss this suit, &c.”
A man by the name of Davenport, opposed the notice to dismiss, alleging that he had an interest in the suit, and then produced a written transfer from said Robert, of the whole of his interest in the slaves be *677 longing to said estate, the execution of which order, dated 7th of April, 1825, was proved in open couri, by the subscribing witness thereto.
The court ordered the suit to be dismissed, but from the language used in the order, it seems that the motion to dismiss, had been made by the executor, instead of the complainant. It commences in the following words: “The court being now sufficiently advised óf, and concerning the defendant's motion herein, to dimiss, &c.”
Pleasant Blakey then filed an amended bill, making Robert Blakey and Davenport defendants. He sets forth Davenport’s claim, stating that he had made the purchase from his bother Robert; had received a written transfer from said Robert, of all his interest in the slaves, and making every allegation which it would have been necessary for Davenport to make, had he been complainant. He charges, that a fraudulent combination existed between Thomas and Robert Blakey, (the defendants,) to cheat him out of his portion of the estate. He alleges, that one of the slaves belonging to the estate, had, since the death of the testatrix, borne a child, and concludes with a prayer for a division of the estate, &c.
Davenport answered, admitting, the statements of the original and amended bills, and exhibiting the writing which Robert Blakey had executed to him, and prays for a decree in his favor against Thomas Bla-key, for the part of the price of said slaves, &c. which he was entitled to under his said purchase.
This amendment was answered by the defendant, Thomas Blakey. He says that he was uninformed of the sale to Davenport, but if it was at all necessary for his defence, he required proof of it, insisting, however, that the sale, if made, was illegal, as he was in the adverse possession of the slaves at the date of the alleged transfer. He acknowledges the increase of the number of the slaves as charged in the amended bill; but still urges thathebad honestly sold, and fairly purchased them, at the price of $1225. A schedule of the sale of the remainder of the property belonging to the estate was filed, as a part of his answer, amounting to about $240.
Error to dismiss suit on the order of oneoomplain-ant, on motion, of defendant, when pendente lite purchaser of interest of said complainant resists the motion.
Robert Blakey failed to answer, and the bill was falten as confessed against him.
On the final hearing of the cause, a decree was entered, directing a sale of the slaves for cash, by a commissioner named, and a division of the money accruing therefrom, between Thomas Blakey, Pleasant Blakey and Davenport, and that the former should pay to each of the latter $127, being the amount to which they were respectively entitled, for the labor of the slaves for three years. The further sum of $124, as one third part of the personal estate, was decreed against the executor, in favor of Pleasant Blakey. Previous to the payment of any of those sums, Davenport and said Pleasant were to execute separate refunding bonds with security, payable to said Thomas Blakey, which bonds with a report of his proceeding, under the decree, the commissioner was directed to'return to court, &c. To reverse this decree, T. Blakey alone has appealed.
That the circuit court erred in dismissing the suit upon the motion of the executor, on the written older, of one of the then complainants cannot admit a doubt. Davenport, as a pendente lile purchaser, had a right to be heard. The execution of the instrument transferring, for a valuable consideration, the interest of Robert Blakey, in the slaves, or rathei in the money arising from their sale, &c. was proved by the subscribing witness. Had Robert Blakey, therefore, been present, and in person, directing the suit to be dismissed, it is by no means clear that the motion ought to have been sustained, unless Davenport had failed to secure him against costs, or unless a want of consideration, or some unfairness in procuring the transfer, had been alleged.
It was not pretended that Thomas Blakey had purchased the interest of his brother, and if he had made any such contract,it was not proper for the court to decree to him the benefit of it upon motion. The correct course was to amend his bill, exhibiting his claim, and thereby affording an opportunity to thejop-posite side, to contest its validity. To such an amendment, as Davenport sat up claim to the same interest, he would have been a necessary party. A stronger illustration of the correctness of this position, could *679 have been given, than is furnished in this very ease, for in his answer to the amended bill, the es.ec-ulor would not venture to assert that he had made any contract whatever with Robert for his share. See the case of Gregory and Houston vs. Power’s heirs, III. Littell, 339.
General rule ®free onedefendant vs. another, , gut if decree otherwise rev. su]ar>14 Wl11 ed on'(he a plication of dy“edh°(lgro' irreglliaritjr,
The alleged error of the court, was produced by the motion of the appellant, and he cannot now justly complain of the attitude occupied by Davenport. As a general rule, it is certainly correct, that a court of chancery ought not to decree in favor of one defendant against another, unless they interplead: as otherwise, no opportunity would be afforded the party injured by such decree, to contest its justice. But here no such reason can be truly assigned. It was evidently by a fraudulent combination with Robert, that the embarrassment was produced, and although it would have been more regular, for Davenport to have been made a party upon bill filed by him, or to have made his answer a cross bill against his co-defendant; yet as (hat was in effect done by the amended bill of P. .Blakey, and, as in his answer, Davenport sets forth his claim, whicSi seems to have been founded upon a valuable consideration, (for the execution of the writing under which he claimed, tras proved upon the tria!) and as he prays for a decree against the appellant, we are not of opinion, that the decree, if otherwise correct, should be reversed in favor of the appellant, who not only committed the first fault, but thereby superinduced the step, which be now complains of as an error. »• -
That the sale, under which the appellant claims the slaves, was a most barefaced fraud, the proof establishes beyond doubt. When the sale of the other property of the estate was made, he refused to sell the slaves, insisting that he had a right to keep them and pay the amount of the appraisement, although he notified the public by advertisement, that they would be sold on that day, and some persons attended with a view to bid for them. He afterwards procured an advertisement ¡o be set up at a mill door, that they would be sold at another day, which was taken down in a few minutes, and before any one had seen it except one individual, whose attention was at *680 tempted to be withdrawn from it, by the person who placed it there. There is no positive proof that this was done by his directions; but there are very strong to believe it. The same individual who managed this part of the affair, when the slaves were sold, acted as crier.
Tfairly'at-118 taptedtoin-himself íte of testa-tr, chance! lc will inter«ne falo luid diiribution.
It is not shewn by the proof, that a single individual in the county, where the"'sa\e took place, had heard of the executors intention to make it, éxcept the man who sat up the advertisement, and the person then present, until the day on which it was made. A few hours previous to the commencement of the sale, the crier, whose name was Clark, called at a few houses, and enquired of the persons living there, if they were going to (he sale. They expressed surprise, having never heard of it before. Some of them, however, went. Clark read to the company present, that part of the will, which related to the sale of the slaves, and enquired of the oldest of said slaves, whom they would choose for their master, to which they replied, Thomas Blakey. Some of the persons,, who bad gone there with the intention of bidding, had the slaves been sold separately, understood that no one bad a right to become a purchaser, unless with the consent of the slaves.
It is evident from the depositions in the Case, that Clark and the executor were anxious to impress upon the company, present such a conviction. They effected their object. No one except T. Blakey did bid, and the slaves were stricken off en masse, to him, at a sum, by several hundred dollars below their value, at a credit of two years. But according to his notions of justice, he cannot be answerable for a distribution of even the price which he agreed to give,' until the lapse of a reasonable period, after it became due.
R was proper, therefore, to decree a sale.of the slaves, as we are clearly of opinion, that the attempt 0f the executor to invest himself with a title to them, was unfair. Indeed, his conduct throughout seems to have been a tissue of fraud and dishonesty, and was such as might have been expected from one, who de-c^ai-'e^» >iS some °f tbe witnesses say he did in their presence, that “no man was better qualified to prnc *681 tice rascality than himself, having studied it all his life, and that he was determined his brothers should never receive one cent of the proceeds of his mother’s estate.”
If executor p0Ssessj0D and had the benefit of their services, no error to ™onaibie'Vt^-hire.'
where executor has fail-etl t0 distri-orsettle^vUh county court, he “ay be ¡^Jrseej Wlth
Settlement after suitin-not £°¡ e regar
Triple!!., for appellant; Mills and Brown, for ap-pellees.
Nor do we perceive any impropriety in that part of the decree, which directs the executor to pay for the labor of the slaves. He had received the benefit of their services, which, accordingto the proof,was not estimated by the court at too high a price. J
As to the sum of $124, decreed to Pleasant Blakey for his portion of estate, besides the slaves, it was not more than the proof in the cause justified.
The witnesses differ somewhat as to the amount of the tobacco, corn and pork, and if a decree for less than ‡124 had been made, we should not have been prepared to say that it was erroneous. It may, per-baps, by a strict calculation, be found to be a few dollars too much, unless the executor be charged with interest on the amount of the sales of the property first sold, from the time the money became due. But that, we suppose, might have been done with propriety.
As to his settlement with the county court, and the allowance made to him, it cannot be regarded; as the order by that court appointing commissioners to make the settlement, was after the institution of this suit; and by his fraudulent conduct, he had forfeited all claim to any compensation for his services as executor.
The decree must be affirmed with costs and damages.